2013 Ark. 148

**Blair STAUTZENBERGER and Estate of C. Elizabeth Osborne, Appellants**

v.

**M. Duane STAUTZENBERGER and Michael Stautzenberger, Appellees.**

No. 12–432.

Supreme Court of Arkansas.

April 11, 2013.

Matthews, Campbell, Rhoads, McClure & Thompson, P.A., by Sarah L. Waddoups, for appellant.

Jerry B. Dossey, PLC, by Jerry B. Dossey, for appellees.

JOSEPHINE LINKER HART, Justice.

From June 7, 2007, to July 24, 2009, Blair Stautzenberger served as guardian of the estate of C. Elizabeth Osborne, his mother. After her death, two of Blair's siblings, Duane and Michael Stautzenberger, challenged his management of the estate. In a November 30, 2011 order, the trial court expressly adopted the findings of master it had appointed. It disallowed $85,747.17 of the expenditures that Blair had made; found that Blair's failure to act as a reasonably prudent investor had cost the estate $201,587.23; found that Blair failed to account for a $15,000 withdrawal from an estate account, for which Blair would be personally liable; and made Blair personally liable for Duane and Michael's attorney fees. On December 8, 2011, Duane and Michael moved to correct the judgment pursuant to Arkansas Rule of Civil Procedure 60, and on February 2, 2012, the trial court filed a modified order that made Blair personally liable for the disallowed expenditures, investment losses, and attorney fees. The modified order, however, took into account that other heirs chose to stand by Blair in this action and, therefore, reduced by sixty percent the amount of money that Blair would have to repay the estate for disallowed expenditures and investment losses.[1]

On appeal, Stautzenberger argues that the trial court erred when it (1) exceeded its authority under Arkansas Rule of Civil Procedure 60 when, in the February 2012 modified order, it found him personally liable for certain expenditures where the original November 2011 order assigned

---

1. We note that the concurring/dissenting justices have apparently misapprehended the trial court's findings. In paragraph 2, the trial court commends Mr. Travis Riggs, the master it appointed, and found Mr. Riggs's work "to be reasonable in its approach and conclusions." Save for a sum attributable to family gifts, paragraph 3 disallows the expenditures made by Blair in accordance with the recommendations made by Mr. Riggs. Likewise, paragraph 7 follows the recommendations of the master and finds that $201,587.23 in investment losses were attributable to Blair failing to follow the reasonably prudent investor standard. Paragraph 9 discusses $15,000 that Blair withdrew from an investment account and never accounted for. Paragraphs 10 and 11 dealt with attorney fees. Paragraphs 4, 5, 6, reject Blair's defenses, and paragraph 8 rejects the testimony and methodology of Blair's expert. Paragraph 12 apportions the award based on the support for or challenge to Blair as the guardian.

him no personal liability and (2) disallowed expenses that contributed to the care and maintenance of Mrs. Osborne, which were consistent with her previous pattern of expenditures and charitable giving. We accepted certification from the court of appeals in accordance with Arkansas Supreme Court Rule 1–2(b)(6) (2012) because this case requires us to construe sections of the Arkansas Probate Code.

During the hearings on Duane and Michael's challenge to Blair's accounting, it was established that Blair became his mother's guardian after the onset of his mother's dementia. However, there was unrefuted testimony from Blair that he had "always" taken care of his mother. Prior to becoming a guardian, Blair held a power of attorney, and Mrs. Osborne had made known that, if she became incapacitated, she preferred that Blair be appointed her guardian. When Mrs. Osborne became incompetent, all of Blair's siblings waived objection to Blair's appointment. According to Blair, his "analysis" in deciding whether to pay an expense was always based on his mother's wishes, conversations that he had with her prior to the establishment of the guardianship, and "historically" what she had done. Blair did not dispute that while serving as guardian, he spent the estate's funds liberally. However, he denied having ever personally benefitted from these expenditures. Blair stated that Mrs. Osborne was generous, and he sought to maintain that characteristic in his management of her funds.

A court-appointed master found that $128,990.86 was misappropriated. Of this total, $37,956 was for Christmas and birthday gifts to family members and $5,893.69 for funeral expenses. Ultimately, the trial court found that Blair should not be personally liable for those disbursements. However, the trial court found that church donations in the amount of $9200, made on behalf of Mrs. Osborne, as well as direct support for her son Robert, totaling $3,383.94, schooling for a handicapped grandchild totaling $15,674, and support for Cheryl Faulkner, who was not a blood relative but whom Mrs. Osborne treated like a daughter, totaling $18,552. Also disallowed was a category referred to as "food and household expenses" that was attributed to Blair's practice of supplying $60 restaurant gift cards that allowed Mrs. Osborne to buy lunch for nursing home staff who took her to church, restaurant food that he brought to the nursing home for Mrs. Osborne, various "parties" that he paid for at the home, postage to mail out items to family members, and other incidental and clothing expenses for Mrs. Osborne at the nursing home, over and above the $7750 per month that was charged for her care. Finally, the trial court disallowed $9207 in cash withdrawals for which there was no evidence of where the money went save for Blair's testimony that Mrs. Osborne always had several hundred dollars in her wallet.

As a preliminary matter, before this case was submitted, appellees moved to strike portions of Blair's reply brief where he challenges the "missing" $15,000 and the $201,587.23 in investment losses. We dispose of this motion by noting that we adhered to our practice of not addressing the merits of an argument raised for the first time in a reply brief. *Small v. State*, 371 Ark. 244, 264 S.W.3d 512 (2007).

Blair first argues that the trial court exceeded its authority under Arkansas Rule of Civil Procedure 60 when it modified its November 30, 2011 order to find him personally liable for certain disallowed expenditures. He asserts that the motion to modify should have been denied because it failed to assert a "clerical mistake, error, or omission." Blair also argues that the

trial court erred in modifying the November 30, 2011 order because it was unnecessary for him to be found personally liable for the expenditures before Duane and Michael could pursue reimbursement from the surety. We do not find these arguments persuasive.

We review a trial court's actions under Arkansas Rule of Civil Procedure 60 under the abuse-of-discretion standard. *Office of Child Support Enforcement v. Pyron,* 363 Ark. 521, 215 S.W.3d 637 (2005). We note that only 62 days had elapsed from the entry of the November 30, 2011 order until the entry of the February 2, 2012 modification. Under Rule 60(a) of the Arkansas Rules of Civil Procedure, within 90 days of entering an order, a trial court has broad authority to correct errors or mistakes or prevent miscarriage of justice by modifying the order or vacating it. Arkansas Rule of Civil Procedure 60(a) states:

> (a) Ninety–Day Limitation. To correct errors or mistakes or to prevent the miscarriage of justice, the court may modify or vacate a judgment, order or decree on motion of the court or any party, with prior notice to all parties, within ninety days of its having been filed with the clerk.

Under Rule 60(a), the only limitation, on a trial court's authority to vacate or modify a judgment is that it be done with "prior notice to all parties." Here, the trial judge stated in open court that she had intended in the original order to make Blair personally liable for the disallowed expenditures. Accordingly, it was well within the trial court's authority to amend the November 30, 2011 order, and we hold that the trial court did not err in entering the modified order.

Blair next argues that the trial court erred when it disallowed expenses that contributed to the care and maintenance of Mrs. Osborne which were consistent with her previous pattern of expenditures and charitable giving. Citing *Federal Land Bank of St. Louis v. Miller,* 184 Ark. 415, 42 S.W.2d 564 (1931), he asserts that "maintenance" encompasses a wide range of circumstances and that this court, in *Francis v. Francis,* 343 Ark. 104, 31 S.W.3d 841 (2000), "expressly approved a trustee's use of trust funds to continue the ward's standard of living." Accordingly, Blair argues that $23,487.57, which was attributed to purchasing restaurant food for Mrs. Osborne and her guests as well as postage to mail gifts to family members, should not have been disallowed because it maintained her "routines and habits as much as possible." Blair further argues that because the trial court removed $37,956.00 attributed to gifts made to family members from the master's list of disallowed expenditures, similar "equitable logic" and statutory authority should apply to excluding the money Blair expended to support family members and maintain her "spiritual welfare" by making offerings to her church.

This court reviews probate proceedings de novo on the record, but we will not reverse the decision of the circuit court unless it is clearly erroneous. *Rodgers v. Rodgers,* 2012 Ark. 200, 406 S.W.3d 422 We likewise will not overturn the probate judge's factual determinations unless they are clearly erroneous. *Id.* We, however, give no deference to the circuit judge with respect to matters of law. *Graham v. Matheny,* 2009 Ark. 481, 346 S.W.3d 273.

The extent to which the expenditures at issue made by Blair, on behalf of Mrs. Osborne, may be construed to be proper for the care and maintenance of the ward is a question of first impression. The Arkansas Probate Code obligates a guardian to "care for and maintain the

ward." Ark.Code Ann. § 28–65–301(a)(1) (Repl.2012). Furthermore, our guardianship statute expressly states that we are to be guided by the law of trusts when evaluating the duties and liabilities of a guardian of the estate. Ark.Code Ann. § 28–65–301(b)(2). We note also that Arkansas Code Annotated section 28–65–308(b) provides:

Upon a showing that the action would be advantageous to the ward and his or her estate, the court may authorize the guardian to make gifts and disclaimers on behalf of the ward.

We hold that the trial court clearly erred in finding that many of the expenditures made by Blair were improper.

First, with regard to the money that Blair spent to continue Mrs. Osborne's practice of supporting family members, we note that Arkansas Code Annotated section 28–72–409(b) (Repl. 2012), which is part of our trust code, specifically authorizes a custodial trustee, without a court order, to continue to support individuals who were supported by a beneficiary when a beneficiary becomes incapacitated. Accordingly, this section authorized Blair to continue Mrs. Osborne's support of Cheryl Faulkner and the expenditure of $18,552, Robert Stautzenberger and the expenditure of $3,383.94, and Oscar Stautzenberger and the expenditure of $15,674. In total, the trial court erred in disallowing $37,609.94 for the support of these individuals.

We also hold that the trial court erred in finding that Blair's facilitating Mrs. Osborne's donations of $9200 to her church was an improper expenditure. In *Winters v. Winters*, 24 Ark.App. 29, 747 S.W.2d 583 (1988), our court of appeals affirmed a guardianship case in which church donations were challenged on appeal. We are persuaded that this holding is proper and hold similarly in this case.

*See also Estate of Powell v. Roper*, 245 S.W.3d 280 (Mo.Ct.App.2008).

Regarding the expenditures labeled "food and household expenses," we note that food and clothing fall well within the definition of what is required for "maintenance." *See Federal Land Bank, supra*. It was undisputed that Mrs. Osborne entertained friends and staff members at restaurants and catered parties at the nursing home. From the record, it is apparent that Mrs. Osborne was able to fully enjoy life. Our probate code does not require that a ward be maintained in an austere and joyless environment. Therefore, these outings and parties properly fall within the definition of care and maintenance. Likewise, it was not contested that Blair took Mrs. Osborne shopping for clothing and other personal items, so the trial court clearly erred in categorically rejecting these expenditures. We nonetheless acknowledge that it is possible that not all of the $23,487.57 in expenditures are reasonable and necessary. We therefore reverse and remand this case to the trial court to make findings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

CORBIN, DANIELSON, and GOODSON, JJ., concur in part; dissent in part.

Paul E. Danielson, Justice, concurring in part, dissenting in part.

While I too would affirm on the Rule 60 issue, I would reverse and remand for entirely different reasons with respect to the disallowance of expenditures. I therefore respectfully concur in part and dissent in part.

First, I agree that the circuit court was within its discretion in modifying its previ-

ous order. Under Ark. R. Civ. P. 60(a) (2012), a circuit court may, within ninety days, modify or vacate a judgment, order, or decree, on its own motion or that of any party, with prior notice to all parties, "[t]o correct errors or mistakes or to prevent the miscarriage of justice." The only limitation on the exercise of the power to set aside the judgment pursuant to Rule 60 is addressed to the sound discretion of the circuit court. *See RLI Ins. Co. v. Coe*, 306 Ark. 337, 813 S.W.2d 783 (1991).

Here, the circuit court specifically found in its modified order that Michael and Duane's motion to modify was a timely and proper motion under Rule 60 that should be granted. Moreover, at the hearing on the motion to modify, the circuit court observed:

Well, that's the problem with doing Orders not in open court because you will get caught missing something that you should have included. And, truly, I fully intended for Mr. Blair Stautzenberger to be ordered to repay the estate for the eighty-five thousand (85,000) and the two hundred and one thousand (201,000), not just the fifteen thousand (15,000) and the attorney fees. The Order should have included an Order that he do that, that he return those funds to the guardian's estate. So, that was an omission by the Court, that will be corrected.

Now, regarding these Waivers, you know these folks aren't making a claim, they've never made a claim, they're not

in front of the court. So, certainly, the amount to be returned to the Estate so that it can be distributed can be lessened by whatever amount those folks would have received. So that can be accomplished using the percentages ... [r]educed down by three fifths.

. . . .

So, those percentages can be dealt with. As far as the attorneys' fees, I've ordered Mr. Blair Stautzenberger to be responsible for his own. And, so, Mr. McClure can simply provide the Court with a letter, at the conclusion stating that Mr. Stautzenberger has paid Mr. McClure's attorney's fees himself and whatever amounts had been otherwise paid by the estate have been replenished by Mr. Stautzenberger, Mr. Blair Stautzenberger. And I don't think we need to go any further than that.

Then once this order has been corrected, the bonding company can be notified that they have a responsibility.

My review of the circuit court's ruling makes clear that the modifications made to the original order were in accord with Ark. R. Civ. P. 60(a) that permits the correction of errors or mistakes within ninety days.

Notwithstanding the plain language of Rule 60(a), Blair asserts that the rule is expressly limited to the correction of the record to make it conform to the action actually taken at the time and not to an action that the court should have taken, but did not take.[1] He is mistaken. That

---

1. This language comes from this court's decision in *Lord v. Mazzanti*, 339 Ark. 25, 2 S.W.3d 76 (1999), wherein this court said:
   Our Rule 60(a), which is identical to Fed. R.Civ.P. 60(a), reads as follows:
   *Clerical mistakes* in judgments, orders or other parts of the record and errors therein arising from oversight or omission *may be corrected* by the court *at any time* on its own motion or on the motion

of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court and thereafter while the appeal is pending may be so corrected with leave of the appellate court. (Emphasis added.)
Rule 60(a) is merely a restatement of Arkansas's well-settled law, empowering the

limitation is inapposite to corrections under the current subsection (a); instead, our jurisprudence makes clear that the limitation exists as to the current subsection (b) of Rule 60, which allows clerical errors to be corrected at any time. *See, e.g., Office of Child Support Enforcement v. Pyron,* 363 Ark. 521, 215 S.W.3d 637 (2005) (observing that the limitation refers to the correction of clerical errors). However, because the current subsection (b) was formerly subsection (a), some confusion occurs. *See, e.g., Watson v. Connors,* 372 Ark. 56, 59, 270 S.W.3d 826, 829 (2008) ("In the amendment to Rule 60, the discussion of 'clerical errors' was moved from paragraph (a) to paragraph (b), and the discussion of vacation or modification of judgments and orders to prevent the miscarriage of justice was moved from paragraph (b) to paragraph (a).").

Because the record in this case makes clear that the circuit court's modified order was an attempt to clarify or correct its prior order and was entered within ninety days, it is my opinion that the circuit court's order was proper and was not outside the confines of Rule 60(a).

With regard to the challenged expenditures,[2] this court in its de novo review on appeal will not reverse the findings of the probate court unless they are clearly erroneous, giving due deference to the probate court's superior position to determine the credibility of witnesses and the weight to be accorded their testimony. *See Barrera v. Vanpelt,* 332 Ark. 482, 965 S.W.2d 780 (1998). A finding is clearly erroneous when, although there is evidence to support it, this court is left on the entire evidence with the firm conviction that a mistake has been committed. *See Seymour v. Biehslich,* 371 Ark. 359, 266 S.W.3d 722 (2007).

Arkansas Code Annotated § 28–65–301 (Repl.2004) provides, in pertinent part, that "[i]t shall be the duty of the guardian of the person, consistent with and out of the resources of the ward's estate, to care for and maintain the ward." Ark.Code Ann. § 28–65–301(a)(1). "[I]f the guardian of the estate has the care and custody of the ward," "the guardian of the estate . . . may apply to the court for an order . . . directing the guardian of the estate to apply a designated amount periodically as the court may direct, to be extended for the care, maintenance, and education of the ward and of his or her dependents." Ark.Code Ann. § 28–65–309(a) (Repl. 2004). This court has held, however, un-

---

trial court to enter *nunc pro tunc* judgments to cause the record to speak the truth, whether in criminal or civil cases. Just recently we upheld a trial court's authority to enter an order *nunc pro tunc* in a criminal case when more than a year and a half had passed since the original judgment had been filed and mandate had issued. While we noted in *McCuen [v. State,* 338 Ark. 631, 999 S.W.2d 682 (1999)] that Rule 60(a) itself does not specifically refer or apply to a criminal case, it is obvious that Rule 60(a) does apply to civil cases, and its plain language adopts the same longstanding rule utilized in all cases—that trial courts may correct clerical errors *at any time.* In these circumstances, a trial court's power to correct mistakes or errors is to make the record speak the truth, but not to make it speak what it did not speak but ought to have spoken.

339 Ark. at 28–29, 2 S.W.3d at 78–79 (internal citations and footnote omitted) (all emphasis in original).

2. As noted by the majority, Blair also challenges the circuit court's entry of judgment against him personally for the $15,000, attorney's fees, and investment losses; however, these arguments are raised for the first time in his reply brief. This court will not consider arguments made for the first time in an appellant's reply brief because the appellee is not given a chance to rebut the argument. *See Coleman v. Regions Bank,* 364 Ark. 59, 216 S.W.3d 569 (2005).

der a prior statute containing similar language,[3] that a probate court does have jurisdiction to allow a guardian credit for amounts expended where the guardian was without an order to do so, but the guardian must realize that should he so expend, he does so at his own risk. *See Robinson v. Hammons*, 228 Ark. 329, 307 S.W.2d 857 (1957) (comparing Ark. Stat. Ann. § 57–307, which the court held required a previous order and was repealed, with Ark. Stat. Ann. § 57–632). Finally, "[u]pon a showing that the action would be advantageous to the ward and his or her estate, the court may authorize the guardian to make gifts and disclaimers on behalf of the ward." Ark.Code Ann. § 28–65–308(b) (Repl.2004).

Here, it is undisputed that Blair lacked an order by the circuit court authorizing him to make the expenditures at issue on his mother's behalf. Nonetheless, this court has previously observed that a "Probate Court could approve the expenditures even after they had been made if the guardian could establish to the satisfaction of the Probate Court that such expenditures were reasonable and proper and were actually expended for the ward." *Shinley v. Ricks*, 234 Ark. 767, 771, 354 S.W.2d 547, 549 (1962). The question then should have been: Were the expenditures made by Blair reasonable and proper and actually expended for Ms. Osborne? Based on the instant record, however, I

am unable to tell whether the circuit court actually made such a determination on each expenditure.

Blair challenges the disallowance of five categories of expenditures: (1) food and other household expenditures from which, Blair claims, Ms. Osborne benefited; (2) financial assistance to Ms. Osborne's handicapped daughter; (3) financial assistance to her learning-disabled son; (4) financial assistance to aid in the schooling of her handicapped grandson; and (5) donations to Ms. Osborne's church. A review of the circuit court's order reveals that the circuit court merely adopted what it deemed findings by Travis Riggs, a certified public accountant ordered by the circuit court to review Ms. Osborne's estate.

Yet, Riggs testified that he reviewed the expenditures and made a list of those that should be disallowed. Riggs testified regarding his criteria for allowing or disallowing an expenditure:

> The law states that we should allow expenditures for the health, maintenance and education of the [ward].... In determining that, we actually had no receipts, no accounting, no documentation supporting these expenditures. What we did have [were] bank statements that indicated entities in which purchases were made; American Express statements which indicated the entities where purchases were made,

---

3. Arkansas Statute Annotated § 57–307 provided, in pertinent part:

> Expenditures.—The probate court may direct a guardian to expend for the maintenance and education of his ward a specified sum, although such sum may exceed the income of the ward's estate; but, without such direction, the guardian shall not be allowed, in any case, for the maintenance and education of the ward, more than the clear income of the estate.

*Robinson*, 228 Ark. at 331, 307 S.W.2d at 858. Section 57–632, however, provided that

> [t]he guardian of the estate ... may apply to the court for an order directing the guardian ... to apply a designated amount periodically as the court may direct, to be expended in the care, maintenance and education of the ward.... In proper cases the court may order payments of amounts directly to the ward for his maintenance or incidental expenses. The amounts authorized under this section may be decreased or increased from time to time by direction of the court.

*Id.* at 332, 307 S.W.2d at 858.

meaning, Wal–Mart, Dillard's, you know, retail outlets. So, by going through those, we, to our best attempt, and through inquiry of . . . Blair. We had a meeting and gave him an opportunity to explain the expenditures, also, since we did not have any actual documentation. Based on that, we made a determination of what was considered eligible or allowed, and those expenditures that were left over are our disallowed expenses. Riggs also said that the key factor he used for analysis in making a determination as to whether an expense was related to the health, education, or maintenance of the ward "would have been Blair's sharing information with us," "where I gave him an opportunity to explain those expenditures." Additionally, he testified to the following, regarding the donations made to Ms. Osborne's church:

> BLAIR'S COUNSEL: You also disallowed any gifts or tithing that the ward made to her church?
>
> RIGGS: I did.
>
> BLAIR'S COUNSEL: Would there be any documentation, for example, for a tithe to a church that would have caused you to allow that expense?
>
> RIGGS: No.
>
> BLAIR'S COUNSEL: Is there any—anything for a ward, with regards to health, education and maintenance, with regard to their spiritual health, education and maintenance that would cause you to allow a tithe to a church?
>
> RIGGS: That wasn't described that way in the rules that I had. . . . I'm just saying with the rules that I [was] given to go by, that was not a distinction that was made for spiritual health or maintenance.

Accordingly, a question remains in my mind whether the proper inquiry was had for each expenditure, as outlined below.

*Food and Other Household Expenditures*

Here, Blair testified that he often bought restaurant gift cards for his mother to give to people who took her to church, such that they could take her to lunch afterward. He also testified that when family came to town, they would all get dinner together and that, as was his mother's custom, she paid for the dinner. In addition, he testified that he brought his mother meals and took her to dinner; he further testified that he would sometimes bring food into the nursing home for parties in his mother's honor.

Even at first blush, it would appear that at least some of these expenditures might qualify as reasonable expenditures for Ms. Osborne's care, maintenance, or education. This would be especially true in the instant case as the duty of the guardian is to provide such, "consistent with and out of the resources of the ward's estate." Ark. Code Ann. § 28–65–301(a)(1). In this case, Ms. Osborne's estate was sizeable.

Our standard for review of the circuit court's disallowance of these expenditures is whether the circuit court clearly erred. However, the circuit court's order leaves me at a loss as to the basis for the disallowance. It is impossible to tell whether the circuit court disallowed the expenditures because (1) Blair failed to obtain an order from the court prior to expending, (2) Blair lacked any documentation to support the expenditures, or (3) the circuit court disbelieved Blair's testimony that these expenditures were for his mother's benefit. Because it is unclear on what basis the circuit court disallowed the expenditures, and because it would appear that there is at least some question as to whether some of these expenditures were for Ms. Osborne's care, maintenance, and education, it seems to me that the circuit court erred in its blanket disallowance of

these expenditures. I would therefore reverse and remand on the question of the propriety of these expenditures.

### Financial Assistance to Ms. Osborne's Daughter

Blair further testified that Cheryl Faulkner was his handicapped sister to whom he had paid $22,915 from his mother's funds. He stated that Ms. Osborne had always provided her daughter with support and paid for the house in which Cheryl lived, as well as the yard's care. And, he testified that he continued this support based on instructions he had received from his mother and her husband before his mother became incompetent.

As set forth above, Ark.Code Ann. § 28–65–308(b) provides that a court may authorize a guardian to make gifts on behalf of the ward, upon a showing that the action would be advantageous to the ward and her estate. But in addition, section 28–65–309 permits the circuit court to direct a guardian to apply a designated amount to be extended for the care, maintenance, and education of the ward and of his or her dependents. Blair contended that he gave money to his sister on his mother's behalf because that was what his mother had previously done and had wanted to be done. However, it appears from the circuit court's order that the circuit court disallowed these payments to Ms. Osborne's daughter because "the Guardian failed to follow through for an Order granting authorization for certain recurring expenditures."

It appears to me that the circuit court's finding of disallowance for these gifts was clearly erroneous where this court has previously held that a probate court does have jurisdiction to allow a guardian credit for amounts expended where the guardian was without an order to do so. *See Robinson, supra.* A probate court can approve the expenditures even after they have been made if the guardian can establish to the satisfaction of the probate court that such expenditures were reasonable and proper and were actually expended for the ward. *See Shinley, supra.*

While it may be debatable whether Cheryl, due to her age, constituted a dependent for purposes of the statute, other courts have found the power of the court or guardian, "in part at least, on findings respecting what provision the incompetent himself, if sane or competent, would have made, [by] applying the 'doctrine of substituted judgment.'" Annotation, *Power of Court or Guardian to Make Noncharitable Gifts or Allowances Out of Funds of Incompetent Ward,* 24 A.L.R.3d 863 (1969). While it does not appear to have been previously recognized by this court, the equitable "doctrine of 'substituted judgment'" allows a court to "authorize a gift which the ward would have made, within limits as to reasonableness considering the size of the ward's estate and the amount of income therefrom." 39 C.J.S. *Guardian & Ward* § 89 (2013) (footnote omitted). Historically, the common-law doctrine of substituted judgment "was used to transcend the strict statutory limitations placed on a guardian of the estate with respect to the management of property of the ward." *In re Guardianship of F.E.H.,* 154 Wis.2d 576, 453 N.W.2d 882, 886 (1990). "In its traditional conception, the rule authorized the court to permit gifts from the disabled ward's estate to persons to whom the ward owed no duty of support." *In re Marriage of Drews by Drews,* 139 Ill.App.3d 763, 94 Ill.Dec. 128, 487 N.E.2d 1005, 1013 (1985). "In determining whether the incapacitated person would otherwise have contributed to the support of a relative to whom he or she owes no duty of support, consideration is given to the needs of the relative, the relationship and intimacy that he or she

bore to the incapacitated person prior to the adjudication of incapacity, the present and probable future requirements of the incapacitated person, the existence of other dependents and the extent of such dependency, and the size and condition of the estate." 39 Am.Jur.2d *Guardian & Ward* § 109 (2013). "Where the evidence is sufficient, the court acts as it supposes the incapacitated person would have acted if he or she were of sound mind, and the amount and proportion of allowances thus made rest entirely within the discretion of the court." *Id.* Blair asserted this doctrine in defending his expenditures, and I believe that the doctrine should be considered by the circuit court in determining whether Blair's expenditures to Cheryl were valid under it, given Ms. Osborne's history in so providing. Therefore, I would reverse and remand on these expenditures such that the circuit court could reconsider them in light of the doctrine set forth above.

### Financial Assistance to Ms. Osborne's Son

Blair also testified that he paid the monthly phone bill of his brother, Gary, as his mother had done. This was another recurring expenditure, which the circuit court disallowed because "the Guardian failed to follow through for an Order granting authorization for certain recurring expenditures." Again, I believe that this finding was clearly erroneous based on our prior case law permitting a circuit court to approve expenditures even after made without a court order. Likewise, the equitable doctrine of substituted judgment might also apply to these expenditures, where it is claimed that Ms. Osborne was paying Gary's phone bill before she became incapacitated. Accordingly, I would reverse the circuit court's disallowance of these expenditures and remand for their consideration in light of the doctrine.

### Financial Assistance to Aid in the Schooling of Ms. Osborne's Grandson

Additionally, Blair testified that his mother began paying for Oscar's daycare in 2002 and his schooling after he graduated from daycare. As was the case with the financial assistance to Cheryl and Gary, the financial assistance for Oscar's schooling was a recurring expenditure, and it is my opinion that the circuit court clearly erred in disallowing these payments on the basis that no prior court order was obtained, for the reasons already set forth. But too, I believe they should be considered in light of the substituted-judgment doctrine. Accordingly, I would reverse the disallowance thereof and remand for further consideration.

### Donations to Ms. Osborne's Church

Finally, Blair testified that he continued to provide Ms. Osborne with an offering to her church each week. He testified that, of her eighty years, she had taken an offering to church for seventy-six of them. As already set forth, I believe the circuit court erred in disallowing these recurring expenditures on the basis that no court order was previously obtained, where we have held that a circuit court is authorized to permit such expenditures after the fact. Moreover, an argument could certainly be made that such donations fall within the care and maintenance of Ms. Osborne's spiritual health. But also, as already set forth, they might be approved based on the doctrine of substituted judgment.

It is the duty of the guardian of an estate to exercise due care to protect and preserve the ward's property. *See* Ark. Code Ann. § 28–65–301(b)(1)(A); *Brasel v. Estate of Harp*, 317 Ark. 379, 877 S.W.2d 923 (1994). In the instant case, Blair's

duty was to care for and maintain Ms. Osborne, consistent with and out of the resources of her estate, and to exercise due care to protect and preserve that estate. *See* Ark.Code Ann. § 28–65–301. His duty was not to Ms. Osborne's heirs, but to her. For each of the foregoing reasons, I would reverse the disallowance of the above categories of expenditures and remand the matter to the circuit court for further consideration in light of my concerns outlined herein. I therefore respectfully concur in part and dissent in part.[4]

CORBIN and GOODSON, JJ., join.

---

**4.** I would also deny Duane and Michael's motion to strike portions of Blair's reply brief, which this court held in abeyance until the submission of the case.